IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| *SHAWN SHERRILL, #471270,* | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:21-cv-01120-JPG |
| | ) | |
| *SHERI MCLEOD, YVONNE ROKITA,* | ) | |
| *BEVERLY AUSTIN, and DR. VIPIN SHAH,* | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANTS SHERI MCLEOD, YVONNE ROKITA, BEVERLY AUSTIN,
AND DR. VIPIN SHAH'S MEMORANDUM OF LAW
IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

COME NOW Defendants, Sheri McLeod, Yvonne Rokita, Beverly Austin, and Dr. Vipin Shah, through counsel, and for their Memorandum of Law in Support of their Motion for Summary Judgment, state as follows:

**INTRODUCTION**

Plaintiff Shawn Sherrill brings a cause of action under 42 U.S.C. §1983 for deliberate indifference to his serious medical needs against Defendants Sheri McLeod, Yvonne Rokita, Beverly Austin, and Dr. Vipin Shah for alleged failure to provide him with supplies and accommodations related to his colostomy while detained at the St. Clair County Jail. The underlying facts of this case demonstrate Defendants were not deliberately indifferent to Plaintiff's medical conditions and that no action or inaction on their part caused injury to Plaintiff. No reasonable jury could conclude otherwise. Therefore, this Court should grant Defendants' Motion for Summary Judgment and dismiss Plaintiff's claims in their entirety with prejudice.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

The Parties

1.      Plaintiff Shawn Sherrill, at all relevant times to his Complaint, was a detainee incarcerated at the St. Clair County Jail (hereafter "the Jail") in Belleville, Illinois, arriving there on February 18, 2021 (*See generally* Exhibit 1, Excerpts from the Medical Records of Shawn Sherrill from the St. Clair County Jail).

2.      At all times relevant to Plaintiff's Complaint, Defendant Sheri McLeod was employed by Wexford Health Sources, Inc. as an LPN (licensed practical nurse) at the Jail (Exhibit 2, Excerpts from the Transcript of the Deposition of Sheri McLeod, Page 15 at lines 13-22, Page 22 at lines 03-08).

3.      McLeod's duties as an LPN at the Jail included assessing patients during nurse sick call, passing medications, performing intake examinations, and handling medical emergencies (Ex. 2, Page 22 at lines 09-20, Page 24 at line 25 through Page 25 at line 01).

4.      During all times relevant to Plaintiff's Complaint, Defendant Nurse Beverly Austin was employed by Wexford Health Sources, Inc. as an LPN at the Jail (Exhibit 3, Excerpts from the Transcript of the Deposition of Beverly Austin, Page 17 at lines 24-25 through Page 18 at lines 01-09, Page 28 at lines 01-10, Page 29 at lines 22-23, Page 34 at lines 03-05).

5.      Nurse Austin's duties at the Jail included passing medications and implementing orders from the doctor (Ex. 3, Page 28 at lines 18-25 through Page 29 at lines 01-05).

6.      During all times relevant to Plaintiff's Complaint, Defendant Yvonne Rokita was employed by Wexford Health Sources, Inc. as an LPN at the Jail (Exhibit 4, Excerpts from the Transcript of the Deposition of Yvonne Rokita, Page 16 at lines 15-25 through Page 18 at lines 01-06).

7.    Nurse Rokita's duties at the Jail included passing medications and occasionally conducting intake examinations for newly arrived detainees (Ex. 4, Page 19 at lines 10-25 through Page 20 at lines 01-10, Page 32 at lines 13-24).

8.    At all times relevant to Plaintiff's Complaint, Defendant Dr. Vipin Shah intermittently worked as a part-time and on-call doctor at the Jail (Exhibit 5, Excerpts from the Transcript of the Deposition of Dr. Vipin Shah, Page 12 at lines 09-11, Page 15 at lines 24-25 through Page 19 at lines 01-17).

9.    In 2021, Dr. Marcowitz was the assigned doctor at the Jail, and Dr. Shah would at times substitute for him when he was on vacation or otherwise unavailable (Ex. 4, Page 22 at lines 22-25 through Page 23 at lines 01-18; Ex. 5, Page 42 at lines 01-19).

Plaintiff's Medical History Prior to Detainment at the Jail

10.    Plaintiff presented to the emergency room with complaints of severe abdominal pain at Belleview Memorial Hospital in Belleview, IL, a CAT scan revealed he had acute appendicitis, and he underwent an appendectomy by Dr. Bernard Szopa on September 14, 2018 (Exhibit 6, Excerpts from the Deposition of Plaintiff, Page 15 at lines 09-25 through Page 16 at lines 01-18; Exhibit 7, Excerpts of Plaintiff's Medical Records from Belleview Memorial Hospital, at Sherrill 741-42).

11.    On September 16, 2018, Plaintiff presented to the ER at Belleville Hospital again with complaints of severe abdominal pain, diagnostic testing revealed he had a perforated sigmoid colon, and he underwent a sigmoid colectomy with end colostomy surgery by Dr. Bernard Szopa that resulted in the removal of part of his sigmoid colon (Ex. 6, Page 15 at lines 09-25 through Page 16 at lines 01-18, Page 18 at lines 02-09, Page 20 at lines 03-11; Ex. 7 at Sherrill 700, 739-40).

3

12.    Plaintiff was discharged from Belleville hospital on September 28, 2018 (Ex. 7 at 729).

13.    Following discharge, Dr. Scott Crouch of Belleview Medical Group wrote an order for Plaintiff to receive ostomy pouch changes twice per week and PRN (as needed) on October 1, 2018 (Ex. 6, Page 101 at lines 15-25 through Page 103 at lines 01-13; Ex. 7 at Sherrill 771).

14.    Dr. Crouch advised Plaintiff there was a risk that changing his colostomy supplies too often would irritate the area around his stoma due to the adhesive tearing up his skin (Ex. 6, Page 40 at lines 04-22).

15.    A stoma is a surgically created part of the colon that feeds feces into a colostomy bag, which results when the colon is resected away from the rectum due to that part of the colon being surgically removed (Ex. 5, Page 8 at lines 08-11, Page 22 at lines 19-25 through Page 23 at lines 01-21).

16.    Colostomy bags should be replaced every three or four days[1] and require the patient to self-maintenance by emptying it into the toilet, then rinsing to clean it out, which helps prevent both leaking and odor (Doc. 1 at 10-12; Ex. 2, Page 38 at lines 06-24, Page 120 at lines 01-22; Ex. 3, Page 113 at lines 19-25 through Page 114 at line 01; Ex. 4, Page 50 at lines 09-25 through Page 53 at lines 01-06; Ex. 5, Page 47 at lines 01-23, Page 66 at lines 10-14, Page 93 at lines 18-24).

---

[1] Although publicly-available guidelines vary, many institutions recommend changing colostomy bags every 3-7 days. *See* Ostomy: Ostomy Pouch, Mayo Clinic, *https://connect.mayoclinic.org/blog/ostomy/tab/pouching/#* (last accessed March 25, 2025); How to Care for an Ostomy, Baylor Medicine, https://www.bcm.edu/healthcare/specialties/surgery/general-surgery/for-patients/how-to-care-for-an-ostomy (last accessed March 25, 2025); How to Use a Pouching System after Ostomy Surgery, UChicagoMedicine, https://www.uchicagomedicine.org/conditions-services/colon-rectal-surgery/ostomy/guide-to-pouching-systems/how-to-use-a-pouching-system (last accessed March 25, 2025).

17.    If patients change their colostomy bags too frequently, it could cause irritation to the skin from repeatedly taking off the adhesive to the stoma (Ex. 2, Page 131 at line 25 through Page 133 at lines 01-18; Ex. 5, Page 84 at lines 11-25 through Page 85 at lines 01-04; Ex. 6, Page 40 at lines 04-22).

<u>Plaintiff's Arrival at the St. Clair County Jail and Provision of Replacement Colostomy Supplies While in the Infirmary February 2021 Through April 2021</u>

18.    Plaintiff was arrested and detained at the Jail on **February 18, 2021** (Ex. 6, Excerpts from the Deposition of Plaintiff Shawn Sherrill, Page 20 at lines 12-21; Exhibit 8, Excerpts from Plaintiff's Jail File, at SCC (IF) 03).

19.    Upon his arrival at the Jail, custody staff initially housed Plaintiff in the infirmary, where he remained from **February 2021 to April 2021**, because he was a "high profile detainee" due to his being jailed on charges of sexual-related offenses involving a minor, and he was also housed in the infirmary due to concerns about care for his colostomy bag (Ex. 1 at MR 17-18, 20-21, 24-26; Ex. 6, Page 46 at lines 23-25 through Page 48 at lines 01-10, Page 88 at lines 12-25 through Page 89 at lines 01-14; Ex. 8 at SCC (IF) 02).

20.    Colostomy supplies, including replacement bags, adhesives, and barriers, generally came in a single set delivered to the patient at the same time (Ex. 6, Page 61 at lines 04-25 through Page 62 at lines 01-16).

21.    Plaintiff was supposed to be allotted a replacement colostomy bag every three or four days while he was housed in the infirmary (Ex. 6, Page 52 at lines 03-17).

22.    Regardless, Plaintiff received new colostomy bags more or less daily while in the infirmary (Ex. 6, Page 165 at lines 10-25 through Page 168 at lines 01-20; Exhibit 9, Excerpts from Plaintiff's Grievance File, at GR 04).

23.    During his time in the Jail's infirmary, Plaintiff at one point was given too many colostomy bags in excess of his designated supply schedule and found to be stockpiling them in his cell, which resulted in custody staff confiscating the colostomy supplies from Plaintiff's cell and caused some nurses to be reprimanded for providing Plaintiff too many colostomy bags (Ex. 3, Page 111 at lines 14-25 through Page 112 at lines 01-22; Ex. 6, Page 50 at lines 12-25 through Page 53 at lines 01-08).

24.    Although the provision of colostomy supplies was not usually documented, Nurse McLeod frequently conferred with the nurse from the previous shift to confirm whether Plaintiff had been given colostomy supplies (Ex. 2, Page 51 at lines 01-15).

25.    Nurse McLeod saw Plaintiff on **February 24, 2021** during which Plaintiff requested his colostomy bag be changed daily, but she explained there was a limited supply of bags monthly, so he would need to change his bag every three to four days, and gave Plaintiff a handout instructing him how to properly empty and clean his colostomy bag (Ex. 1 at MR 27; Ex. 2, Page 92 at lines 14-25 through Page 93 at lines 01-20).

26.    While at the Jail, Plaintiff received a handout entitled "Ostomy Care: Emptying Your Pouch" which instructed colostomy patients how to empty and clean their colostomy bag, but Plaintiff already knew how to care for his colostomy bag before he arrived at the Jail (Doc. 1 at 10-12; Ex. 2, Page 124 at lines 22-25 through Page 126 at lines 01-14; Ex. 3, Page 57 at lines 21-25 through Page 58 at lines 01-02, Page 58 at lines 17-25 through Page 60 at lines 01-23, Page 61 at lines 22-25 through Page 62 at lines 01-14; Ex. 6, Page 85 at lines 11-25 through Page 88 at lines 01-02, Page 110 at lines 04-18).

27.    A nurse saw Plaintiff at the St. Clair County Jail on **March 3, 2021,** for an intake examination, where Plaintiff reported a medical history of hypoglycemia, enlarged heart, asthma,

6

and colostomy two years ago (Ex. 1 at MR 22). Plaintiff's medical problem list sheet dated

March 3, 2021, stated that he used new Jamage 2 piece drainable ostomy pouch #18194 2 ¾'' 70

mm from Hollister and #14604 ostomy barriers Bx/5 (Ex. 1 at MR 02).

28.     Nurses at the Jail had the ability to give Plaintiff a new colostomy bag regardless

of the usual schedule if Plaintiff showed her an obvious defect with the bag such as a leak or tear

(Ex. 3, Page 39 at lines 19-25 through 40 at lines 01-13; Ex. 5, Page 66 at lines 10-14, Page 93 at

lines 18-24).

29.     Plaintiff had a colostomy bag on him each time he requested additional supplies

from nursing staff (Ex. 6, Page 128 at lines 12-25 through Page 129 at lines 01-16).

30.     **The longest time Plaintiff went without receiving replacement colostomy**

**supplies at the Jail was three days** (Ex. 6, Page 169 at lines 04-09).

Conditions in the Jail's Infirmary and Plaintiff's Request to Use the Nurses' Bathroom in the
Medical Office Across From the Infirmary Due to Alleged Threats by Other Detainees

31.     The Jail's infirmary consisted of a room with around ten bunks lined up in rows,

with a toilet, sink, and shower in the back corner of the room sectioned off from the rest of the

room by a partition bolted to the floor (Ex. 2 at Page 52 at lines 10-25; Ex. 6, Page 55 at lines 07-

25 through Page 56 at lines 01-16; Exhibit 10, Select Photographs of the St. Clair County Jail, at

Sherrill 803-06, 813-20).

32.     Some detainees threatened Plaintiff because they did not want to be around

someone charged with sex crimes involving a minor (Ex. 6, Page 177 at lines 10-25 through

Page 178 at lines 01-08).

33.     During Plaintiff's time in the infirmary, McLeod recalled some instances where

Plaintiff complained of threats by other detainees, so the nursing team allowed Plaintiff to use

the bathroom in the booking department to empty and clean his colostomy bag, but once he

7

moved out of the infirmary, nurses lacked control over the ability to do this (Ex. 2, Page 71 at lines 01-25 through Page 73 at lines 01-24).

34.    Plaintiff did not complain to Nurse Austin about lacking a private clean place to change his colostomy bag or about other detainees making threats against him (Ex. 3, Page 43 at lines 23-25 through Page 44 at lines 01-24).

35.    There was a bathroom in the medical office intended for personal use by nurses working at the Jail; Although McCleod and Austin were not aware of a specific policy forbidding detainees' use of the bathroom in the medical office, they did not believe they had the authority to allow it aside from a patient using the restroom there to provide a urine sample for medical purposes (Ex. 2, Page 54 at lines 17-25 through Page 56 at lines 01-24; Ex. 3, Page 46 at lines 09-25 through Page 48 at lines 01-10).

36.    It was not medically appropriate to allow Plaintiff to use the restroom in the medical office to change his colostomy bag because he was expected to empty and clean his colostomy bag in the bathroom in his cell, because it could contaminate other parts of the examination room if he were allowed to regularly use it, and because it would require custody officers to be available to escort Plaintiff from his housing unit to the restroom each time he needed to use it (Ex. 3, Page 46 at lines 09-25 through Page 48 at lines 01-10; Ex. 5, Page 66 at lines 15-25 through Page 67 at lines 01- 07, Page 81 at lines 12-25 through Page 82 at line 01).

37.    Dr. Shah would not have a medical reason to issue a single-cell permit for a colostomy patient unless there was concern for the patient being infectious or having an abnormal odor, such as one instance where he recalled assigning a single-cell permit to a prisoner whose colostomy bag had an unusual odor indicative or a possible c-diff infection (Ex. 5, Page 67 at lines 22-25 through Page 70 at line 01).

38.    Dr. Markowitz gave the order to release Plaintiff from the infirmary on or around

April 8, 2021 (Ex. 2, Page 89 at lines 02-11; Ex. 8 at SCC (IF) 06).

Provision of Colostomy Supplies to Plaintiff's Housing Unit Following Infirmary Discharge

39.    A detainee at the Jail typically requests medical care by submitting a sick call

form (at first a paper form, later via electronic kiosk), being seen in nurse sick call where a nurse

discusses the issues listed on the sick call form with the patient, makes a decision about whether

to refer the patient to doctor sick call, then goes to doctor sick call where a doctor will address

the issues on the sick call form and make a treatment plan ((Ex. 4, Page 24 at lines 05-25 through

Page 25 at lines 01-22; Ex. 6, Page 72 at lines 18-25 through Page 75 at lines 01-25).

40.    Plaintiff's housing units at the Jail following his discharge from the infirmary had

a roughly similar layout to the infirmary, consisting of rows of metal bunk beds and tables with a

toilet, sink, shower, and trash can at one end of the cell separated by a partition (Ex. 10 at

Sherrill 772-75, 781-87, 796-99, 827-30, 842-43).

41.    The med pass cart that nurses at the Jail used to distribute medications to

detainees at their housing units only contained medications and did not contain medical supplies

such as replacement colostomy bags (Ex. 4, Page 35 at lines 14-24; Ex. 6, Page 128 at lines 08-

11).

42.    Plaintiff filed a grievance on April 8, 2021, complaining he did not receive his

colostomy supplies from Nurse Sherri (Defendant McLeod) during med pass at 10:30 p.m. that

day (Ex. 9 at GR 2). He wrote that Nurse Sherri told rudely told him she would bring them when

she came back (Ex. 9 at GR 2). Plaintiff stated he had been having this issue since arriving in the

infirmary on February 18, 2021, and that his colostomy bag was so overflowed with feces that it

presented a health hazard (Ex. 9 at GR 2). The grievance officer responded to Plaintiff's Request

on April 8, 2021 by stating that Plaintiff informed him about his colostomy supplies, he spoke to Nurse Sherri, who said she would bring the supplies during med pass, but did not bring the supplies during med pass as she said and then stated she would bring them back (Ex. 9 at GR 2). The grievance officer forwarded the Request to the supervisor, who noted Plaintiff was issued a new bag by nursing staff and forwarded the Request to the administrator (Ex. 9 at GR 2).

43.    After he filed grievances against McLeod, Plaintiff began intermittently avoiding her and chose to ask other nurses for help instead of her because he did not believe she would help him (Ex. 6, Page 143 at lines 03-25 through Page 145 at lines 01-04).

44.    Plaintiff submitted a grievance on April 9, 2021, complaining he told Nurse Beverly (Defendant Austin) he needed Colostomy supplies at 10:07 a.m. that day, Nurse Beverly said she would come back with the supplies around 11:00 a.m., but did not come back (Ex. 9 at GR 3). He stated he saw Nurse Beverly again at 12:26 p.m., who said she did not deliver him colostomy supplies because she forgot where he was and again said she would bring them to him (Ex. 9 at GR 3). The grievance officer noted on April 9, 2021, that the Request was given to medical, and the supervisor responded on April 12, 2021, by writing that drainable pouch bags should be changed on average every four days (Ex. 9 at GR 3). The supervisor also wrote that the bags may last longer, up to seven days, with appropriate care, and that it is not necessary to obtain a new drainable colostomy bag on a daily basis (Ex. 9 at GR 3).

45.    Nurse Austin does not recall an incident like the one described in Plaintiff's April 9 grievance occurring, denied she ever refused to give Plaintiff a colostomy bag, and said she was not involved in the Grievance officer's response to this incident (Ex. 3, Page 94 at lines 07-25 through Page 96 at lines 01-16).

46.     Plaintiff wrote a grievance on April 9, 2021, complaining that he requested colostomy supplies from Nurse Sherri at 3:30 p.m. that day, but she stated Plaintiff received them yesterday when he in fact had not (Ex. 9 at GR 4). The grievance officer forwarded the Request to medical on April 9, 2021 (Ex. 9 at GR 4). The supervisor responded to the Request on April 12, 2021, by writing that **Plaintiff had been given new colostomy bags daily in the infirmary**, and that after transferring out, he should need bag drainage every four days (Ex. 9 at GR 4). The supervisor further stated that an open drainage system bag could last up to seven days depending on care and use (Ex. 9 at GR 4).

47.     Plaintiff filed another grievance on April 10, 2021, complaining he needed toilet paper and the corrections staff would not give it to him (Ex. 9 at GR 6). He complained that C.O. Germaine ignored his complaints about extra toilet paper (Ex. 9 at GR 6). The grievance officer responded to Plaintiff's Request on April 10, 2021, by stating toilet paper and soap were issued by the supply officer every Monday and that toilet paper was available for purchase at the commissary (Ex. 9 at GR 6). The supervisor agreed with the grievance officer's response on April 10, 2021 (Ex. 9 at GR 6).

48.     The provision of toilet paper was handled by custody staff and Plaintiff never complained to McLeod or Austin of having insufficient supplies to clean his bag and stoma such as toilet paper (Ex. 2, Page 67 at lines 10-22, Page 114 at lines 19-25 through Page 116 at lines 01-06; Ex. 3, Page 63 at lines 10-25 through Page 64 at lines 01-19).

49.     Plaintiff wrote another grievance on April 12, 2021, complaining he requested colostomy supplies from Nurse Beverly at 3:44 p.m. that day but did not receive them until 11:50 p.m., over 8.5 hours later (GR 21). The grievance officer forwarded the Request to the medical department on April 13, 2021, and the supervisor responded the same day by stating the average

11

number of days to use a colostomy bag is four, and referred Plaintiff to an informational sheet
about how to empty an open-ended bag (GR 21-22).

50.    Nurse Austin denies the incident Plaintiff described on April 12, 2021, because
she did not recall an instance where she refused to provide replacement supplies as Plaintiff
claimed (Ex. 3, Page 99 at lines 06-25 through Page 101 at lines 01-03).

51.    It was Nurse Austin's practice to respond to Plaintiff's requests for a new
colostomy bag by reviewing his medication sheet and asking other nurses if Plaintiff had recently
been given replacement supplies, and she would give Plaintiff a replacement bag if it was
indicated by the three-day schedule (Ex. 3, Page 36 at lines 01-25 through Page 38 at lines 01-
14).

52.    Neither McLeod nor Austin recalled Plaintiff complaining to them about the
adhesive wafer around his stoma being improperly cut, but it was their practice to respond to
such complaints by re-cutting another one or altering the existing wafer and providing it to the
patient (Ex. 2, Page 67 at lines 23-25 through Page 68 at lines 01-20; Ex. 3, Page 64 at lines 21-
25 through Page 65 at lines 01-24).

53.    Plaintiff filed a Grievance on April 13, 2021, complaining of not receiving
colostomy supplies (Ex. 9 at GR 14). He wrote in the grievance that without proper colostomy
supplies such as bags, barriers, adhesive rings, and adhesive paste tubes, feces got under his
colostomy barrier rings and onto his skin, exposing him to infection (Ex. 9 at GR 14). He
explained that barrier glue comes loose with sweat and showers, allowing feces to get under the
barrier and onto his skin (Ex. 9 at GR 14). Plaintiff requested supplies and changing daily to
maintain proper self-care and keep healthy and safe from possible infection (Ex. 9 at GR 14). He
said when he told Nurse Sherri his bag was overflowing with feces, she told him "oh well I am

12

the only one working" with an extremely rude attitude (Ex. 9 at GR 14). Captain Collins responded to Plaintiff's Grievance on April 13, 2021, by referring Plaintiff to documents received from medical which instructed him on how to empty his colostomy bag into the toilet and reclip it, and admonished him to never let his bag to "overflow with feces" (Ex. 9 at GR 14-16).

54. Nurse Austin recalled Plaintiff telling her he had feces on his skin or clothes, or making a similar complaint, essentially every day, but she remembered observing no feces on Plaintiff's skin or clothes each time she investigated his complaints (Ex. 3, Page 43 at lines 06-22).

55. The only times Nurse McLeod recalled Plaintiff complaining of feces getting onto his skin was when his colostomy bag was full because he refused to empty it, which would not happen had he regularly emptied his bag (Ex. 2, Page 60 at lines 16-25 through Page 64 at lines 01-13; Page 132 at lines 19-23).

56. Plaintiff testified at his deposition that he knew it was his responsibility to empty his colotomy bag and that generally, when his colostomy bag was full, it was because he had recently awoken from sleep and had not had an opportunity to drain it yet after the bag filled during the night (Ex. 6, Page 160 at lines 12-25 through Page 162 at lines 01-07).

57. Signs of an infection in the stoma include smelly yellow-greenish discharge, pain, and fever (Ex. 5, Page 21 at lines 20-25 through Page 22 at lines 01-02).

58. Plaintiff did not develop an infection related to his colostomy bag while he was in the St. Clair County Jail (Ex. 6, Page 68 at lines 03-25 though Page 69 at lines 01-17).

59. Plaintiff submitted a grievance on April 14, 2021, complaining he told Nurse Yevonne (Defendant Rokita) at 2:30 p.m. that day that his bag was overflowing with feces, to

which she responded by saying she would inform the medical department but said Plaintiff could

empty the bag out (Ex. 9 at GR 10). He wrote he saw Nurse Yevonne again at 3:35 p.m. but did

not bring colostomy supplies with her despite knowing where Plaintiff is housed (Ex. 9 at GR

10). The grievance officer forwarded the Request to medical on April 15, 2021, and the

supervisor responded the same day by referring Plaintiff to an information sheet about emptying

a colostomy bag (Ex. 9 at GR 10-12).

60.    Although Nurse Rokita did not recall an incident like the one described in

Plaintiff's April 14 grievance occurring, she testified at her deposition that it was incumbent on

Plaintiff to empty his colostomy bag if it was full rather than ask for a new bag, and that he must

have emptied it after the alleged encounter because she did not recall hearing any subsequent

complaints about the bag exploding from becoming overfull (Ex. 4, Page 56 at lines 13-25

through Page 59 at lines 01-04).

61.    Rokita was not notified of any grievance being filed against her during her time

working at the Jail (Ex. 4, Page 27 at lines 16-18).

62.    In response to Plaintiff's complaints about not receiving colostomy bags following

his discharge from the infirmary, Dr. Shah ordered colostomy bags every three days as needed on

**May 20, 2021** to ensure he kept on a consistent schedule, and Plaintiff received new colostomy

bags every three days thereafter from May through December 2021 (Ex. 1 at MR 34-36, 38-41;

Ex. 2, Page 99 at lines 11-25 through Page 101 at lines 01-22; Ex. 5, Page 46 at lines 15-25

through Pate 48 at lines 01-25; Ex. 6, Page 169 at lines 04-09).

Plaintiff's Complaints of Stool Coming from his Anus and Complaints of Rectal Bleeding

63.    Plaintiff was seen in nurse sick call on **August 9, 2021,** for issues related to his

colostomy (Ex. 1 at MR 16). He complained to a nurse of feces coming out of his colon (rather

than going into his colostomy bag) when he sat down on the toilet and had a small bowel movement (Ex. 1 at MR 16). The nurse called Dr. Shah to explain the situation, who asked if the patient reported any pain, to which the nurse responded that Plaintiff denied pain (Ex. 1 at MR 16). Dr. Shah instructed the nurse to monitor Plaintiff for additional/continued symptoms, and Plaintiff was visibly upset with the treatment plan and then stated there was also blood in his stool (Ex. 1 at MR 15-16). The nurse examined Plaintiff and observed no blood or trace of blood on the anus (Ex. 1 at MR 15). Upon examination of the ostomy, the nurse saw fecal matter inside the colostomy bag (Ex. 1 at MR 15). The nurse called Dr. Shah again to inform him of Plaintiff's reports of blood, but Dr. Shah said it was okay and instructed the nurse to continue to monitor Plaintiff because the nurse reported a normal examination (Ex. 1 at MR 15; Ex. 5, Page 57 at lines 18-25 through Page 98 at lines 01-20).

64.     Later on August 9, 2021, Plaintiff complained during another nurse sick call encounter that he had abdominal pain in his right upper quadrant and had fecal matter passing from his rectum with blood (Ex. 1 at MR 15). He reported abdominal pain starting at approximately 1:21 p.m. that day which he described as "crampy" and "2/10" level of severity (Ex. 1 at MR 15). The nurse conducted an examination that resulted in a normal exam, as she found all abdominal quarters negative to palpation with bowel sounds heard in all quadrants as well (Ex. 1 at MR 15; Ex. 5, Page 57 at lines 18-25 through Page 98 at lines 01-20). Visual inspection of the anus showed no evident blood, but Plaintiff stated that if he bore down weight, fecal matter would emerge (Ex. 1 at MR 14). The nurse cleaned the area and observed that when Plaintiff bore down, she was able to collect a scant creamy brown sample with strong odor noted (Ex. 1 at MR 14). She collected a stool sample from the colostomy bag as well, sent both samples to the lab for analysis, and contacted Dr. Shah about Plaintiff's symptoms and samples (Ex. 1 at

15

MR 14). The nurse observed Plaintiff ambulate with a steady gait from nurse sick call (Ex. 1 at MR 14).

65.    A laboratory report from UI Health on August 11, 2021, revealed the stool samples taken from Plaintiff were negative for clostridium dificile ("c-diff"), with no other abnormality noted in the report either (Ex. 1 at MR 28-29; Ex. 5, Page 67 at lines 22-25 through Page 70 at line 01).

66.    It is generally impossible for a patient who has undergone a colostomy and has a stoma to pass feces through his rectum because the procedure results in the intestinal connection to the rectum being severed; However, it is possible for such patients to have a discharge like mucus come from their anus, but it is not feces (Ex. 5, Page 22 at lines 19-25 through Page 23 at liens 01-21, Page 76 at lines 05-23).

67.    No medical professional at the Jail ever told Plaintiff his stool samples had tested positive for blood (Ex. 6, Page 122 at lines 08-22).

68.    Plaintiff electronically submitted a Request/Complaint on August 9, 2021, complaining he had solid stool coming from his rectum the previous night despite the fact that he has a colostomy, and that the doctor refused to see him because he did not have any pain instead of sending him to the hospital (Ex. 9 at GR 60). A medical temp responded to Plaintiff's Request/Complaint the same day, stating Plaintiff was seen in nurse sick call and Dr. Shah was notified of Plaintiff's condition but no new orders were received, and instructed Plaintiff to let medical know if he had additional issues or problems (Ex. 9 at GR 60).

69.    Plaintiff electronically submitted another grievance on August 9, 2021 complaining he needed additional colostomy supplies and cleaning materials, to which a medical temp responded by instructing Plaintiff to notify medical if he needed additional bag adhesive or

supplies other than what he received every three days or if he was unable to care for himself and needed supervision, for which he would be called to medical for colostomy bag changes (Ex. 9 at GR 61).

70.    Plaintiff electronically submitted a grievance on August 9, 2021, complaining he told a nurse that day that he had feces leaking into his body and leaking from his rectum, but the nurse refused to bring him to medical for treatment and failed to treat the situation as a medical emergency (Ex. 9 at GR 59). A custody officer responded on August 10, 2021, by stating that Plaintiff was seen by medical at 6:30 p.m. on August 9, 2021 (Ex. 9 at GR 59). A medical temp responded the same day and stated Plaintiff was seen in medical and evaluated again for the second time in less than 24 hours, and explained a sample was collected to be sent off to the lab and the doctor was called again to be appraised of the ongoing situation (Ex. 9 at GR 59). Jail Superintendent Collins determined the Grievance does not meet requirements on August 10, 2021 (Ex. 9 at GR 59).

71.    Plaintiff electronically submitted a grievance on August 12, 2021, complaining he told nursing staff he needed to change bags daily in the nurse sick call room due to the enclosed environment, but the nurses refused (Ex. 9 at GR 58). The grievance was forwarded to the medical department, and a medical temp responded on August 13, 2021, by stating Plaintiff was aware of the schedule for new bags (Ex. 9 at GR 58).

72.    Plaintiff filed suit on September 10, 2021 (Doc. 1).

73.    After Plaintiff filed suit, there were instances where Nurse McLeod refused to directly respond to his requests for medical care and sent another nurse to do it instead (Ex. 2, Page 122 at lines 08-25 through Page 123 at lines 01-10; Page 130 at lines 21-25 through Page 131 at lines 01-22; Ex. 6, Page 131 at lines 03-25).

74.     Plaintiff electronically submitted a grievance on October 17, 2021, asking for more toilet paper, to which the shift commander responded by stating a roll of toilet paper and a tower will be issued to him the same day (Ex. 9 at GR 41). Plaintiff electronically filed a Captain's Request on October 27, 2021, asking for more than one roll of toilet paper per week, to which the supply officer responded by saying Plaintiff can ask the block officer for a roll of tissue when needed (Ex. 9 at GR 39).

75.     Dr. Shah wrote an M.D. note on December 19, 2021, where he recounted Plaintiff's reported medical history of having a colostomy since 2018 (Ex. 1 at MR 7; Ex. 5 at Page 51, lines 17-25 through Page 53 at lines 01-06). He assessed Plaintiff as having a DPP rupture and ordered cleansing of Plaintiff's colostomy bag and changing colostomy supplies every three days, which functioned as a renewal of his prior order related to Plaintiff's colostomy supplies (Ex. 1 at MR 3, 7; Ex. 5 at Page 51, lines 17-25 through Page 53 at lines 01-06).

76.     Plaintiff reported facing threats by other detainees to custody staff on multiple occasions during his time at the Jail because of the nature of his criminal charges and because of issues related to his medical safety, and custody staff responded to these complaints by either moving Plaintiff to a different housing unit, moving the threatening detainee from Plaintiff's housing unit, and maintaining an "enemies list" of individuals to keep separate from Plaintiff due to threats (Ex. 6, Page 126 at lines 01-14; Ex. 8 at SCC (IF) 06-07, 26-32).

77.     Plaintiff transferred from the Jail to Menard Correctional Center in early August 2022, then transferred from Menard to Shawnee Correctional Center on August 15, 2022, then from there to Pinckneyville Correctional Center on May 5, 2023, where Plaintiff reported being given replacement colostomy supplies once per week at those facilities (Ex. 6, Page 24 at lines 20-25 through Page 28 at lines 01-05).

## ARGUMENT

**A.    Standard for Summary Judgment**

Summary Judgment is proper if the pleadings, discovery documents and affidavits "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).  An issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 447 U.S. 242, 248 (1986).

The moving party carries the burden of producing "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Carett,* 477 U.S. 317, 323 (1986).  The moving party may meet their burden by "showing…an absence of evidence to support the non-moving party's case." *Id.* at 325.  After the moving party has successfully met their burden, the non-moving must plead specific facts to show there is a genuine issue. Fed. R. Civ. P. 56; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250.

**B.    Objective Unreasonableness Standard For Pretrial Detainees Under the Fourteenth Amendment.**

Plaintiff, a pretrial detainee at the time of suit, alleges the Defendants denied him adequate medical care and sanitary conditions in connection with his colostomy bag while detained at the St. Clair County Jail since February 18, 2021 (Doc. 10 at 1-2). A § 1983 claim that a state pretrial detainee has received inadequate medical care is predicated on the rights secured by the Fourteenth Amendment's Due Process Clause. *James v. Hale*, 959 F.3d 307, 318 (7th Cir. 2020) (citing *Miranda v. County of Lake*, 900 F.3d 335, 346-47 (7th Cir. 2018)). Claims

of inadequate medical care while in pretrial detention are subject to an objective-reasonableness standard. *Id.* (citing *Miranda*, 900 F.3d at 352).

The plaintiff bears the burden to demonstrate objective unreasonableness, and he must make a twofold showing. First, he must show that the defendant acted purposefully, knowingly, or recklessly when considering the consequences of his response to the medical condition at issue in the case. *Id.* (citing *McCann v. Ogle County*, 909 F.3d 881, 886 (7th Cir. 2018)). A showing of negligence or even gross negligence will not suffice. *McCann*, 909 F.3d at 886. Second, the plaintiff must show that the challenged conduct was objectively unreasonable considering the totality of the relevant facts and circumstances. *Id.* Plaintiff has not presented, and cannot present, sufficient evidence for a reasonable jury to find in his favor on either element of the claim.

**C.     The Defendants Provided Adequate Colostomy Supplies to Plaintiff**

*1.     It was Reasonable for Defendants to Provide Replacement Colostomy Supplies Every Three Days*

Plaintiff alleges he needed his colostomy bag to be replaced at the Jail every one or two days, but the Defendants refused to replace it more than once or twice weekly (Doc. 10 at 1). The main crux of the case is that Plaintiff desired changes in colostomy supplies daily, but the evidence overwhelmingly demonstrates the medical standard for replacing colostomy supplies is to replace supplies every three to seven days for drainable colostomy bags like Plaintiff wore (Statement of Material Facts, hereafter "SOF," at ¶ 13, 16, 25, 62, 69, 77). Further, there is a medical contraindication[2] to allowing a patient to replace colostomy bags too frequently due to the risk of the skin around the stoma becoming irritated from placing and removing the adhesive

---

[2] Changing a colostomy pouch too frequently can exacerbate irritation of the skin around the stoma. Early Stomal Complications, National Library of Medicine, https://pmc.ncbi.nlm.nih.gov/articles/PMC2780191/#:~:text=Changing%20of%20the%20appliance%20too%20frequently%20results,pouch%20change%20every%203%20to%207%20days (last accessed March 25, 2025).

too often (SOF at ¶ 14, 17). It is undisputed that Plaintiff received colostomy supplies in excess of his three-day schedule while he was in the Jail's infirmary from February 18, 2021, to April 8, 2021, leading to custody staff confiscating excess colostomy supplies from his cell (SOF at ¶ 21-23). Following release from the infirmary, Plaintiff lodged a series of complaints and grievances during April 2021, leading to Defendant Dr. Shah issuing a formal doctor's order for colostomy bag changes every three days, which was not usually done for colostomy patients at the Jail, due to Plaintiff's repeated complaints and difficulty maintaining the recommended supply schedule (SOF at ¶ 42, 44, 46, 49, 53, 59, 62). Ultimately, Plaintiff concedes he received changes in colostomy supplies within the medically recommended schedule, as he never went more than three days without a change in colostomy bag (SOF at ¶ 30).

### 2. There is No Evidence Defendants Demonstrated a Pattern of Ignoring Plaintiff's Complaints of Defective Colostomy Supplies

Having resoundingly established the Defendants were reasonable in replacing Plaintiff's colostomy supplies within the medical guidelines of every three days, Plaintiff's next argument will undoubtedly be to nitpick the sufficiency of the colostomy supplies provided to him, chiefly by complaining the Defendants ignored occasions where there was a leak or tear in his bag, and by complaining the adhesive affixing the bag to his stoma came loose on a number of occasions or was otherwise inadequate to adhere the bag to his torso.

Defendant-Nurses McLeod, Austin, and Rokita had the ability to replace colostomy supplies outside of the three-day schedule if there was a discernible defect with the bag or related items (SOF at ¶ 28). However, the record does not demonstrate that Plaintiff complained to the Defendants of a leak, tear, or rip in his colostomy bag but was ignored (SOF at ¶ 52, 69).

Plaintiff's primary harm claimed to result from the alleged failure to provide adequate colostomy supplies was a risk of infection, buttressed by claims of having feces on his skin due

21

to the bag becoming overfilled or the adhesive coming loose (SOF at ¶ 42, 53, 59). However, even if Plaintiff did have feces on his skin as he claimed, it was a problem of his own making caused by failure to follow proper self-care procedures. Plaintiff knew how to empty and clean his colostomy bag and understood it was his responsibility to regularly do so to avoid potential leaks or ruptures (SOF at ¶ 16, 26, 56, 59-60). He was able to perform maintenance on his colostomy bag at a level sufficient to avoid developing any serious medical risks like an infection during his time at the Jail (SOF at ¶ 58).

Despite this, Plaintiff complained to the medical department multiple times that his colostomy bag was full of feces, leading prison personnel to respond to one of Plaintiff's written grievances by admonishing him to never let his bag "overflow with feces" as reported (SOF at ¶ 42, 53, 59). Moreover, Nurse Austin recalled several occasions where Plaintiff reported feces on his skin, but she found no signs of it upon observation, and Nurse McLeod noted that Plaintiff's colostomy bag was full each time he complained of having feces on his skin (SOF at ¶ 54-55). Bafflingly, when asked why he would not simply empty his colostomy bag as directed, even if only to maintain more comfort with a defective bag that allegedly leaked, Plaintiff claimed he only allowed his colostomy bag to become full when he had just awoken from sleep and had not had a chance to empty it yet (SOF at ¶ 56). This explanation is devoid of credibility given firstly, Plaintiff could probably have emptied and cleaned his full colostomy bag in the time it took to make a formal complaint about it, and secondly because some of the specific times of day Plaintiff referenced in his grievances as having a full bag are not conducive to the morning hours one would expect to see from a patient who simply lacked the opportunity to empty his bag yet after waking, such as complaining of an overfull bag at 10:30 p.m. on one occasion and 2:30 p.m. on another (SOF at ¶ 42, 59). Given Plaintiff's admission that he both knew how to

maintain his colostomy bag and knew it was his responsibility to do so at the Jail yet persisted in complaining to nursing staff of having an "overflowing bag," it was more than reasonable for the Defendants to simply direct him to empty his colostomy bag in response to his complaints.

This case is substantially similar to one out of the Third Circuit, *Ayala v. Terhune*, which likewise involved allegations of medical personnel failing to provide adequate colostomy supplies to a patient. *Ayala v. Terhune*, 195 F. App'x 87, 91 (3d Cir. 2006). In *Ayala*, the plaintiff, as here, demanded daily changes in colostomy bags and complained of having to use the regular trash to dispose of his used colostomy bags. *Id*. However, the *Ayala* Court determined that at best, an occasional failure to provide colostomy bags and directing the plaintiff to use the regular trash for spent colostomy bags amounted to medical negligence and not a deprivation of Constitutional rights. *Id*. The Court should make the same determination here because at worst, even taking Plaintiff's dubious and non-credible testimony as true, he sporadically had instances of no more than three days where he had a defective colostomy bag that needed to be replaced. This likewise amounts at most to medical negligence, especially given there is no evidence Plaintiff developed an infection related to his colostomy bag because of these practices, as in *Ayala*.

**D.    Plaintiff Did Not Develop An Infection or Other Serious Complication Related to his Colostomy During his Time at the Jail**

On August 9, 2021, Plaintiff complained of passing stool out of his rectum instead of his colostomy bag, which the parties agree would be highly unusual for a patient with a colostomy bag given the connection between colon and anus was supposed to have been severed during Plaintiff's previous surgery (SOF at ¶ 15, 66). Dr. Shah took this complaint very seriously and ordered diagnostic testing for possible c-diff infection, a type of infection he had seen in colostomy patients he treated previously, which came back negative (SOF at ¶ 37, 64-65).

Plaintiff expressed dissatisfaction with the treatment plan for his complaints of stool coming out of his anus, so he fell back on complaints of rectal bleeding that could not be confirmed on examination (SOF at ¶ 63-64). While Plaintiff was able to produce a scant amount of material[3] from his rectum when he bore weight down on his bottom on this occasion, this was likely a mucus discharge and not truly feces that had passed through the rectum, in Dr. Shah's medical opinion (SOF at ¶ 64, 66).

A pretrial detainee alleging inadequate medical care must establish to a degree of medical certainty that the defendants in-fact caused an actionable injury or provide medical evidence of a known increased risk because of the defendants' actions. *Williams v. Patel*, No. 11 C 9193, 2013 U.S. Dist. LEXIS 161358, at *12-15 (N.D. Ill. Nov. 13, 2013)(finding a pretrial detainee failed to establish medical causation of his injuries attributable to the defendants' periodically changing his wound dressing on a less-frequent basis). Plaintiff here concedes he did not suffer an infection related to his colostomy during his time at the Jail and cannot point to any other serious complication suffered as a result of the Defendants' actions (SOF at ¶ 57-58). Nor can Plaintiff establish within a degree of medical certainty that the Defendants' actions were the motivating cause of an increased risk of harm.

**E.    There Was No Medical Need for the Housing Accommodations Plaintiff Requested In Connection with His Colostomy.**

In addition to his complaints of insufficient colostomy supplies and inadequate medical treatment rendered in response to his concerns, Plaintiff additionally alleges he lacked a sanitary and safe environment in which to empty and clean his colostomy bag. Specifically, Plaintiff demanded to use the private restroom for the nurses' use in the medical office, asked for

---

[3] As Dr. Shah opined, it is expected for colostomy patients to continue to pass occasional mucus through the anus despite severance of the colon's connection to the rectum that can feel similar to a bowel movement. Colostomy, Cleveland Clinic, https://my.clevelandclinic.org/health/procedures/22100-colostomy (last accessed March 25, 2025).

additional toilet paper with which to clean his colostomy bag, and requested a permit for a single-cell with his own bathroom amenities. He claims the chief harm he suffered because of not being granted these accommodations was threats by other detainees because of the smell of his colostomy bag.

1. *Dr. Shah Determined It Was Not Medically Necessary to Issue Plaintiff a Special Medical Permit Related to his Housing or Restroom Use*

Plaintiff demanded to be brought to the medical office to use the private restroom intended for medical staff and claims this measure was necessary to ensure his safety from the threats of other detainees upset by the smell of his colostomy bag. Contrary to Plaintiff's allegations, it was not medically necessary to issue a permit for Plaintiff to use the medical office to empty and clean his colostomy bag, nor was a special medical request for single-cell housing or additional toilet paper necessary.

Medical professionals are protected from liability under the Fourteenth Amendment when rendering medical care to a pretrial detainee if their medical decisions reflect a proper exercise of their independent medical judgment, unless that judgment is found to be such a significant departure from accepted medical standards that no minimally qualified medical professional would have responded the same way under those circumstances. *Smith v. Kapotas*, No. 18 C 4260, 2020 U.S. Dist. LEXIS 17529, at *9 (N.D. Ill. Feb. 4, 2020). Further, a pretrial detainee is not entitled under the law to demand specific care nor state a Constitutional claim by merely questioning his medical provider's medical judgment. *Id.* (*citing McCaskill v. Manilla*, No. 13 C 3166, 2014 U.S. Dist. LEXIS 179186, 2014 WL 7476232, at *4 (N.D. Ill. Dec. 30, 2014)).

As argued previously, the Defendants in this case reasonably exercised their medical judgments by replacing Plaintiff's colostomy supplies every three days in accordance with medical standards, and by investigating Plaintiff's medical complaints related to his colostomy.

In doing so, Defendants acted consistently with not only the medical personnel who provided Plaintiff with instructions on ostomy care outside of the prison system as set out in Paragraph 13 of the Statement of Facts but also consistently with instructions provided to the general public from some of the most well-recognized institutions in the Country as set out in footnote 1 to Paragraph 16 of the Statement of Facts of which this Court mat take judicial notice. *See Grimes v. Navigant Consulting*, 185 F. Supp. 2d 906, 913 n.7 (N.D. Ill. 2002)(*citing Austin v. American Ass'n of Neurological Surgeons*, 253 F.3d 967, 971 (7th Cir. 2001)(allowing the Court to take judicial notice of reliable medical information published on the internet).

With respect to medical permits, Plaintiff was not entitled to demand specific treatments or medical accommodations from then nurses and providing treatment to him. The Defendants' refusal to issue medical permits for Plaintiff to use the nurses' restroom, receive extra toilet paper, or be placed in single-cell housing were motivated by a reasonable exercise of their medical judgment. Dr. Shah, as a medical provider with the ability to make treatment plans and issue medical orders, (SOF at ¶ 8-9, determined in his medical judgment that it was inappropriate to allow Plaintiff to empty and clean his colostomy bag in the medical office chiefly because it was Plaintiff's responsibility to perform maintenance relating to his bag in the bathroom in his housing unit, and because there was a risk of contaminating the medical unit through Plaintiff's regular use of it (SOF at ¶ 36). There was likely no medical reason to issue a single cell permit to Plaintiff because Dr. Shah reserves that treatment accommodation for patients suspected of having an infection that could spread to other detainees, which was not indicated in Plaintiff's case (SOF at ¶ 37, 65).

There is no indication aside from Plaintiff's own testimony that he complained to the Defendants of lacking cleaning supplies such as toilet paper to maintenance his colostomy bag.

Additionally, it must be inferred that since detainees at the Jail shared a restroom, custody staff was responsible for stocking that shared restroom and it would not have been practical to designate a specific detainee to receive more toilet paper because he likely would have had unavoidable issues with other detainees trying to take extra rolls from him were he allowed to keep it in his personal property. However, while it may have been theoretically possible for Defendants to issue Plaintiff some kind of permit or recommendation for extra toilet paper (however impractical), the record demonstrates that such matters were handled by custody staff rather than medical personnel, as custody staff responded to multiple complaints Plaintiff made concerning toilet paper by notifying him how to request and obtain more of it (SOF at ¶ 47-48, 74). Ultimately, the Defendants were not made aware of any serious risk to Plaintiff's health resulting from a lack of toilet paper, so it cannot be said the Defendants' treatment regarding this issue was unreasonable.

2. *The Defendants Responded Reasonably to Reports of Threats Against Plaintiff and Relied on Custody Staff to Ensure Plaintiff's Safety*

Aside from Plaintiff's allegation of facing an uncontrolled risk of infection, Plaintiff's second primary claim for damages results from an alleged risk of physical harm by other detainees due to the smell of his colostomy bag and use of the shared bathroom to clean it. As discussed previously, Plaintiff could have minimized the smell from his colostomy bag had he regularly emptied and cleaned his colostomy bag to prevent leaking and odor (SOF at ¶ 16). Plaintiff's failure to abide by medical instructions that specifically told him to clean his bag to avoid odor must be considered when analyzing the risk Plaintiff faced by other detainees.

Critically, Plaintiff admitted the nature of his criminal charges led other detainees to threaten him, and that his charges were a significant factor in the threats he faced by other detainees (SOF at ¶ 19, 32, 76). This casts serious doubt on Plaintiff's allegation that he faced

27

threats by other detainees primarily as the result of inadequate colostomy supplies or any perceived inaction by the Defendants. Indeed, despite there being no medical need to do so, some of the Defendant-nurses and other members of nursing staff at the Jail responded to instances where Plaintiff complained of threats by other detainees by allowing him to use the bathroom in the booking department to empty and clean his colostomy bag (SOF at ¶ 33). However, nursing staff lost the ability to grant this unnecessary accommodation to Plaintiff after he transferred out of the Jail's infirmary and into the regular housing units farther away from the medical office (SOF at ¶ 33).

Medical providers cannot be found to have violated the Constitution for situations in which they have no control. *Walker v. Benjamin*, 293 F.3d 1030, 1038 (7th Cir. 2002); *see also Norwood v. Ghosh*, 723 Fed.Appx. 357, 364 (7th Cir. 2018). In this case, the Jail's custody officers were responsible for Plaintiff's housing assignment and were responsible for ensuring his safety and access to toilet paper (SOF at ¶ 33, 48, 74, 76). Moreover, the record demonstrates custody staff responded to Plaintiff's complaints of threats by other detainees on multiple occasions by moving either Plaintiff or the threatening detainee(s) to another housing location and keeping track of detainees who were hostile to him (SOF at ¶ 76). Notably, Plaintiff's Complaint does not allege he was in-fact injured in an altercation with another detainee on account of his colostomy bag. Instead, the Complaint merely alleges he faced a risk to his health brought on by threats by other detainees. As discussed previously, despite the Defendants doing what they felt they could to ease the risk of harm by other detainees, the Defendants and medical staff more broadly ultimately lacked control over the situation under the circumstances because they could not control the nature of Plaintiff's charges, his self-care behavior, his housing assignments, or his physical safety in his housing unit.

Under these circumstances, Plaintiff cannot show that the Defendants knowingly or recklessly injured Plaintiff or that the treatment provided was objectively unreasonable.

## <u>CONCLUSION</u>

WHEREFORE for the reasons expressed in his motion and this Memorandum in Support, Defendants Sheri McLeod, Yvonne Rokita, Beverly Austin, and Dr. Vipin Shah request this Court enter Summary Judgment in their favor, dismiss Plaintiff's claims with prejudice, and for such other and further relief as the Court deems just and proper under the circumstances.

SANDBERG PHOENIX & von GONTARD P.C.

By:  */s/ Alejandro S. Valdez*
Rodney M. Sharp, #6191776IL
Alejandro S. Valdez, #68528MO
701 Market Street, Suite 600
St. Louis, MO  63101-1826
314-231-3332
314-241-7604 (Fax)
rsharp@sandbergphoenix.com
avaldez@sandbergphoenix.com

*Attorneys for Defendants Dr. Vipin Shah, Sheri McLeod, Beverly Austin and Yvonne Rokita*

**<u>Certificate of Service</u>**

I hereby certify that on this the 25th day of March 2025, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon the following:

Megan Pierce
Maria Makar
Arthur Loevy
Gianna Gizzi
Loevy + Loevy
megan@loevy.com
makar@loevy.com
arthur@loevy.com
gizzi@loevy.com
*Attorneys for Plaintiff*

*/s/ Alejandro S. Valdez* _____