IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

SHAWN SHERRILL, # 471270,

    Plaintiff,

        v.

NURSE SHERRI, NURSE YEVONNE,
NURSE BEVERLY, and DR. SHAH,

    Defendants.

Case No. 21-cv-1120-JPG

## MEMORANDUM AND ORDER

This matter is before the Court on the motion for summary judgment filed by defendants Beverly Austin, Sheri McLeod, Yvonne Rokita, and Dr. Vipin Shah (Doc. 95). Plaintiff Shawn Sherrill has responded to the motion (Doc. 99), and the defendants have replied to that response (Doc. 103).

## I.    Background

Sherrill asserts in this case that the defendants, medical providers working at the Saint Clair County Jail ("Jail"), violated his Fourteenth Amendment due process rights when they responded in an objectively unreasonable manner to his medical needs. In February 2021, he arrived at the Jail with a colostomy.[1] Before being detained, he had been accustomed to changing his colostomy bag every day in his own private home bathroom. This was not his experience in the Jail where the

---

[1] "A colostomy is an opening in the colon that lets stools pass from the body without going through the anus. During colostomy surgery, an opening is made in the belly called a stoma. Part of the colon is brought through that opening and attaches to a pouch outside the body. Stools pass through the opening and go into the pouch. This is called a pouching system. The pouch is emptied about 1 to 2 times a week. Many people refer to the pouch as a colostomy bag." Mayo Clinic, Colostomy: Surgery, Bags and Stoma Care, https://www.mayoclinic.org/tests-procedures/colostomy/about/pac-20583139 (visited Feb. 2, 2026). A pouching system "includes both a pouch to hold the stool, often called a colostomy bag, and a sticky barrier called a wafer. The wafer attaches the pouch to your skin and protects the skin. The opening in the wafer should fit closely around the edge of your stoma to protect your skin as much as possible." *Id.*

expected frequency of his bag change was limited by medical recommendations and where he shared a communal bathroom with other detainees.  He was first housed in the infirmary where defendant nurses McLeod, Rokita, and Austin cared for him daily.  In April 2021, he was transferred to a regular housing unit where he saw the defendant nurses on a regular but limited basis.  In both settings, he complains of the nurses' and Dr. Shah's support of his colostomy care.  In August 2021, Sherrill's complaints changed to include the response to his claims of passing feces and blood from his rectum.  Sherrill left the Jail in August 2022.  The defendants claim Sherrill was provided medically necessary care and suffered no injury as a consequence of that care.

Because there is conflicting evidence regarding whether defendants McCleod, Rokita, and Austin provided objectively reasonable care to Sherrill, the Court will deny the motion for summary judgment as it applies to them.  Those claims must be decided by a jury.  However, because no evidence shows defendant Shah's care was inadequate, the Court will grant summary judgment in his favor.

## II.    Summary Judgment Standard

Summary judgment is appropriate only if the moving party can show "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The moving party has the burden of establishing that no material fact is genuinely disputed.  *Celotex*, 477 U.S. at 323; *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013).

Once a properly supported motion for summary judgment is filed, the adverse party "must set forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 250

2

(internal quotations omitted).  The Court does not decide the truth of the matters presented, and it cannot "choose between competing inferences or balance the relative weight of conflicting evidence." *McCottrell v. White*, 933 F.3d 651, 657 (7th Cir. 2019) (internal quotations omitted). On the contrary, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.  If the "evidence is such that a reasonable jury could return a verdict for the nonmoving party[,]" then a genuine dispute of material fact exists. *Zaya v. Sood*, 836 F.3d 800, 804 (7th Cir. 2016) (internal quotations omitted).

### III.    Facts

The admissible evidence and the reasonable inferences that can be drawn from it, viewed in Sherrill's favor, establish the relevant facts set forth below.  Many facts are taken from Sherrill's deposition testimony and are not corroborated by other evidence.  In their reply, the defendants object to the Court's crediting Sherrill's "own self-serving deposition testimony." *See, e.g.,* Defs.' Reply 4 (Doc. 103).  However, such testimony is entirely acceptable to consider at the summary judgment stage provided the individual making the statement has personal knowledge of the facts and is not speculating. *Whitlock v. Brown*, 596 F.3d 406, 411-12 (7th Cir. 2010) (citing *Payne v. Pauley,* 337 F.3d 767, 772 (7th Cir. 2003)).  The same is true for affidavits that do not contradict sworn testimony and that are not transparent shams. *Bank of Ill. v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1168-72  (7th Cir. 1996).

That is not to say, however, that the Court will allow a "sham affidavit" that contradicts the affiant's prior deposition testimony. *Gills v. Hamilton*, 164 F.4th 640, 644-45 (7th Cir. 2026); *Clacks v. Kwik Trip, Inc.*, 108 F.4th 950, 956 (7th Cir. 2024).  Even affidavits that do not directly contradict prior testimony can be excluded by this rule if they "add new factual details not previously disclosed in deposition testimony when those details seek to undo the effects of the prior testimony and manufacture a dispute to get past summary judgment." *Clacks*, 108 F.4th at 956.

3

The Court declines to declare as a wholesale sham Sherrill's sworn declaration in opposition to summary judgment (Doc. 99-11).  However, it will disregard statements therein that are conclusory or speculative or that advance assertions that would unto the import of his deposition testimony.

Considering Sherrill's deposition testimony and the admissible parts of his declaration, it is clear that the Court cannot grant summary judgment for the defendants on all of Sherrill's claims.

A.    <u>Medical History</u>

Sherrill arrived at the Jail having had a colostomy in 2018.  Sherrill's doctor had prescribed colostomy bag changes twice a week and as needed, and he left it to Sherrill to decide when to change his bag.  Generally, a bag change is needed more frequently if there are tears or holes in the pouch or if feces gets between the barrier and the skin.  Changing an ostomy pouch too frequently can cause skin irritation from removing the adhesive to the stoma.  Sherrill ended up changing his pouch every day because he felt he needed to in light of his sweating that loosened the adhesive.  He never experienced skin irritation from too frequent changes.

B.    <u>The Jail</u>

Sherrill continued that self-care until he was arrested and taken to the Jail on February 18, 2021.  The defendants worked at the Jail.  Specifically, Dr. Shah was a medical doctor employed by Wexford Health Sources, Inc. ("Wexford") to serve the Jail.  He visited the Jail twice a week to see detainees as scheduled by nurses, occasionally filled in when other doctors were not available, and was on call twenty-four hours a day to provide medical instruction by telephone.  Defendants McLeod, Rokita, and Austin were licensed practical nurses also employed by Wexford.  As nurses, their duties included seeing detainees during "sick call," passing out medications, performing intake examinations on those arriving in the Jail, handling medical emergencies, and carrying out orders from the doctor serving the Jail.

4

C.    Time in Infirmary

When Sherrill arrived at the jail in February 2021, he was housed in the infirmary for the first few months because of his colostomy.  When Sherrill and Rokita[2] met on February 24, 2021, to discuss managing his colostomy, he requested daily bag changes, but she told him he could change his bag every three to four days because supplies were limited.  Sherrill wanted more frequent changes because when his bag filled up, it would leak onto his skin.  He emptied his bag two to three times a day.  One of the nurse defendants told Sherrill he needed to empty his bag more often so it would not become so full and gave him a handout about how to empty and clean his bag.  The nurses did not physically demonstrate how to empty the bag or assist him because they believed he had had the colostomy long enough to know how to care for it himself.  Indeed, Sherrill told Austin he knew how to change, empty, and clean his pouch, but the nurse defendants never watched him to verify this.

Some of the other nurses in the infirmary gave him a new bag every day at his request for the first few weeks.  Consequently, he was able to keep a few extra bags on hand so he would have one immediately if he needed it.  Those extra bags were located in a shakedown and confiscated.

After that, the nurses gave him a new bag every three days or more often if there was something wrong with the bag system.  Sherrill never went more than "about three days" without receiving a new bag.  Sherrill dep. 169:9 (Doc. 99-7).  The nurses stuck to this schedule and communicated among themselves to determine when Sherrill had last received a bag and when he was due for another one.  At first, they did not document when they provided him bags, relying on their memory and communications with others.  When Sherrill requested a new bag before three days had passed, the nurses would tell him he was not due for another one.

_____

[2] The medical note for this encounter was signed by McLeod, but Sherrill insists his discussion was with Rokita.

On occasion, Sherrill would request a new bag because feces had leaked and gotten between the wafer and his skin, causing skin irritation and odor. The defendant nurses would not check to verify the leak and would not give him a new bag if it was less than three days from his last bag. As a consequence, Sherrill suffered itching, irritation, and bleeding where feces contacted his skin.

Sherrill was expected to empty and change his pouch in the communal bathroom used by fifteen to twenty-five other detainees. The bathroom area had only a chest-high metal panel separating him from others. The other detainees did not like to wait while Sherrill performed his colostomy self-care and did not like the smell. Sherrill would have to fill his bag with rinse water from the same faucet the detainees drank from. Other detainees complained about the smell from Sherrill's colostomy bag and became upset when he used the communal sink to rinse his bag of feces. The other detainees also did not like him because of the nature of his criminal charges (sex offense). On at least one occasion, a detainee smacked Sherrill in the face. Multiple times Sherrill asked for permission to use the nurses' sick call bathroom, which had a sink, toilet, and sanitary supplies, but the nurses said no, although no official policy prohibited them from allowing Sherrill to use it. On one occasion, an unidentified nurse allowed Sherrill to use the bathroom in the booking department.

The nurses did not ask Dr. Shah to give Sherrill a single cell permit and did not summon Sherrill to nurse sick call to empty and clean his bag. Sherrill's request to Dr. Shah for a single-cell permit was lost. Had he received a request, Dr. Shah would have considered giving Sherrill a single-call permit if there had been indications of contagion from his bag, but he was not aware of any.

D.    Time in the Cell Block

On April 8, 2021, a Jail doctor ordered Sherrill to be transferred out of the infirmary to a housing unit. Sherrill's housing unit was arranged similarly to the infirmary in that the communal

toilet, sink, and shower were separated from the rest of the unit by a metal partition. He was expected to empty, clean, and change his pouch in that area. As in the infirmary, some inmates did not want to be around Sherrill because of the nature of the charges pending against him and because of the smell of his colostomy bag. They threatened to attack him, which caused his housing assignment to be changed several times.

Detainees in a housing unit who wanted medical care had to submit a sick call form to see a nurse, who would discuss the problem with and/or examine the detainee and then decides whether the detainee needed to see a doctor for the medical problem on the sick call form.

In addition to sick call, the nurses took medication carts around the housing units daily to distribute medicine to detainees ("med pass"). Colostomy supplies were not stocked on the medication carts, so when Sherrill asked for them, a nurse doing med pass could not immediately provide them and would have to arrange to deliver the supplies to Sherrill later. Sometimes it was hours later, and on occasion the supplies never arrived.

The day he arrived in the housing unit, Sherrill's bag became overflowing, but McLeod was not able to immediately get him a new bag. He filed a grievance against McLeod. Thereafter, she told him that she could not help him in light of the grievance, but she asked another nurse to help him instead. Sherrill tried to avoid McLeod as well because he thought she would not help him. He continued asking for colostomy supplies from McLeod and Austin at med pass, and they did not provide them if it was within three days of his last bag. Sherrill's requests for more bags became frequent, as did his grievances when he did not immediately get them, so on May 20, 2021, Dr. Shah gave explicit orders for him to receive a new bag every three days, and the nurses began documenting when he received bags.

Sherrill was told in August 2021 that if he needed additional adhesives or supplies, he should let the medical staff know, and if he felt he was unable to care for himself, he could be

7

called up to medical for his bag changes.  Nevertheless, the nurses continued to enforce the three-day schedule and continued to refuse his requests to come to the infirmary to use the nurses' bathroom to change his bag.  On occasion, Sherrill did not receive a new bag every three days.

Sherrill also had an insufficient supply of toilet paper, which was necessary to clean his bag after emptying it.  When he asked the defendant nurses for extra toilet paper, they said he would have to ask the doctor or correctional staff.  He submitted a request to the doctor, but it was lost. Correctional staff refused to give him extra toilet paper but told him he could buy it from the commissary.

Sherrill also complained to the nurse defendants that they had cut his wafer improperly so that it had sharp edges that cut into his skin.

In early August 2021, Sherrill reported during sick call that he has passed a small amount of feces through his anus, an odd event in light of his colostomy.  By telephone, Dr. Shah ordered the nurse to monitor Sherrill for additional symptoms since the nurse told him Sherrill was not reporting any pain.  Sherrill was actually experiencing pain.  Sherrill then reported there was also blood in the stool he passed.  The nurse told Dr. Shah that she had examined Sherrill's anus and found no blood, so Dr. Shah continued to order only monitoring.[3]  In another sick call later in the day, Sherrill reported abdominal pain as well as blood and feces through his anus.  The nurse obtained samples from his anus and his colostomy bag for analysis and reported to Dr. Shah, who did not order anything other than continued monitoring.  The samples analyzed were normal.

Sherrill managed to see Dr. Shah by putting another reason on his nurse sick call form, and when he arrived to see Dr. Shah, he attempted to talk about his passage of feces and blood.  Dr.

---

[3] There is a dispute whether a nurse actually made the examinations on this day, but there is no dispute that she reported to Dr. Shah that she had.  Since the nurse is not a defendant, her response is not relevant.  What Dr. Shah knew is.

Shah again refused to talk to him about it since it was not the reason he had been allowed to see the doctor, but said there was nothing he could do other than monitor him. Sherrill believes Dr. Shah should have examined him personally or sent him to the emergency room for treatment.

At no point in the Jail's custody did Sherrill develop any infection related to his colostomy, although he suffered pain, extreme irritation, bleeding, and itching from leaking bags.

E.     <u>Lawsuit</u>

Sherrill filed this lawsuit on September 10, 2021, asserting one count: a Fourteenth Amendment due process claim against McLeod, Rokita, Austin, and Dr. Shah for denying him adequate medical care and sanitary conditions in connection with his colostomy bag (Doc. 10). Thereafter, McLeod continued to avoid contact with Sherrill by sending another nurse whenever he needed something. In December 2021, Dr. Shah ordered cleansing and changing his bag every three days.

The defendants now seek summary judgment on the grounds that (1) Sherrill received sufficient colostomy bags, (2) the environment he requested to change his bag was not necessary and was outside the defendants' control, and (3) he did not suffer any injury or substantial risk of harm because of the defendants. Sherrill contests each ground.

**III.    Analysis**

A.     <u>Legal Standard</u>

To show that conditions of confinement violated the Constitution, a plaintiff must prove two things. First, the conditions of confinement must be objectively serious enough to pose a substantial risk of serious harm. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *see Smith v. Dart*, 803 F.3d 304, 309 (7th Cir. 2015). Second, the defendant must have a sufficiently culpable state of mind. *Farmer*, 511 U.S. at 834.

The state of mind with respect to a pretrial detainee's claim about conditions of confinement

is the objective reasonableness standard of the Fourteenth Amendment Due Process Clause. *Hardeman v. Curran*, 933 F.3d 816, 823 (7th Cir. 2019) (citing *Kingsley v. Hendrickson*, 576 U.S. 389, 396-97 (2015)). This includes claims of inadequate medical care for a serious medical need. *James v. Hale*, 959 F.3d 307, 318 (7th Cir. 2020); *McCann v. Ogle Cty., Ill.*, 909 F.3d 881, 886 (7th Cir. 2018); *Miranda v. County of Lake*, 900 F.3d 335, 352 (7th Cir. 2018).

The controlling inquiry in the medical context consists of two steps. The first step focuses on the intentionality of the defendant's conduct and asks "whether the medical defendants acted purposefully, knowingly, or perhaps even recklessly when they considered the consequences of their handling of [the plaintiff's] case." *See Miranda*, 900 F.3d at 353. A finding of negligence, even gross negligence, is not enough. *McCann*, 909 F.3d at 886.

The second step asks whether the challenged conduct was objectively reasonable based on the totality of the circumstance faced by the defendant. *Id*. There must be evidence from which a reasonable jury could find "that the defendants did not take reasonable available measures to abate the risk of serious harm to [the plaintiff], even though *reasonable officers under the circumstances would have understood the high degree of risk involved*, making the consequences of the defendants' conduct obvious." *Pittman by & through Hamilton v. Madison Cnty.*, 108 F.4th 561, 572 (7th Cir. 2024), *reh'g denied,* No. 23-2301, 2024 WL 3889635 (7th Cir. Aug. 21, 2024), and *cert. denied,* 145 S. Ct. 1154 (2025).

Thus, to withstand summary judgment on his Fourteenth Amendment due process claim, Sherrill must show that there are genuine issues of material fact regarding whether he had an objectively serious medical need and whether the defendants responded in an objectively unreasonable way. *See Williams v. Ortiz*, 937 F.3d 936, 943, (7th Cir. 2019). No defendant contends that Sherrill's colostomy care was not a serious medical need. Further, with a few exceptions as noted in the discussion, the defendants' conduct was purposeful, knowing, or

reckless, that is, they did not accidentally or negligently act toward Sherrill.  So the Court focuses on whether the defendants' conduct was objectively unreasonable in light of the risk that a reasonable professional in their positions would have understood.

The defendants argue that they provided Sherrill adequate colostomy supplies according to the three-day schedule with additional supplies provided if a bag was defective or failed.  They also argue there is no evidence from which a jury could conclude that they unreasonably responded to Sherrill's complaints of feces between the barrier and/or his complaints of passing feces and blood through his anus.  They point to the lack of any actual harm from their conduct.  They claim that the accommodations Sherrill expected—use of the nurse sick call bathroom, more toilet paper, or a single cell—were not medically necessary, and that their response was objectively reasonable. Finally, they argue that their response to Sherrill's complaints that the smell of his colostomy created a safety risk from other inmates was reasonable where Sherrill refused to perform self-care that would have minimized the smell.

Sherrill contends that even expecting him to empty and change his colostomy bag in a communal bathroom was objectively unreasonable because it imposed an untenable safety risk from other detainees.  He claims the inadequate provision of supplies forced him to endure feces on his skin, in turn causing pain, itching, bleeding, odor, humiliation, embarrassment, fear and distress.

B.    Responses to Sherrill's Serious Needs

1.    Providing New Bag Every Three Days

There is no evidence from which a jury could find the three-day schedule objectively unreasonable.  Sherrill admitted that the most he went without a new bag was "about three days"; the failure of medical records to reflect this frequency on occasion is not enough to suggest the three-day schedule was purposefully, knowingly, or recklessly ignored.  And his bag was able to be emptied more frequently to avoid overfilling and to minimize leaks.  No evidence suggests that this

schedule, so long as it included a proviso to replace malfunctioning bags right away, was not medically adequate. In sum, it was objectively reasonable for the defendants to prescribe and abide by a schedule to replace Sherrill's colostomy bag every three days.

2.    Replacing Malfunctioning Bags

The evidence, viewed in Sherrill's favor, shows that he requested replacement bags more often than every three days because of malfunctions in the bag he was using—leaks, feces between the wafer and his skin, separation of the wafer from his skin, poking by a poorly cut wafer—but that some nurses refused to examine him to verify a problem. Even the three-day replacement schedule called for interim replacement if there was a problem. A reasonable jury could find that it was objectively unreasonable for a nurse not to at least examine Sherrill's bag when he complained of a problem or, in the alternative, to simply credit his complaint and give him a replacement bag. The defendants' motion makes no attempt to distinguish which of the nurses ignored such complaints, so summary judgment must be denied as to the nurse defendants based on these facts.

Related to this set of facts is the nurses' lack of attention to whether Sherrill knew how to avoid bag problems by emptying his bag so it would not become full. To the extent this aspect of his medical care was even pleaded as part of this case, no reasonable jury could find the failure to instruct Sherrill further was anything more than mere negligence. A reasonable nurse receiving Sherrill's numerous complaints about his overfull bag might have questioned why Sherrill was not emptying it before it became full in the first place. Indeed, the written instructions given to Sherrill suggest a bag should be emptied when it is about a third full. Even though he had managed his colostomy for two years prior to being detained, the failure to empty his bag on a timely basis was a problem. However, no evidence suggests any defendant purposefully, knowingly, or recklessly made a decision not to provide further education or demonstration to Sherrill about the process. Indeed, no evidence shows Sherrill even sought such additional attention. Any failure to do so was,

at the most, negligence that does not support a Fourteenth Amendment due process claim.

### 3.    Environment to Change Bag

There is no evidence that Sherrill had a medical need to empty or change his bag in a special environment (the nurse sick call bathroom or a single cell) outside a communal bathroom. He suffered no infection from being forced to use the communal bathroom for colostomy care, and the injuries he did suffer—irritation, itching, bleeding, etc.—were not the result of a lack of a sanitary environment.  The defendants' responses to his requests for a different, more sanitary environment, were objectively reasonable in light of his actual medical needs.

His safety needs are another matter.  There is evidence that Sherrill's use of the communal bathroom offended other inmates.  It resulted in spilling feces on surfaces outside the toilet, using the sink from which others drank to rinse feces from his bag, and creating smells from the process itself as well as insufficiently airtight disposal bags.  While Sherrill was a target of other detainees because of the nature of his charge, there is evidence that it was also due in part to the less pleasant parts of caring for his colostomy in a communal area.  At least one nurse in the infirmary recognized this risk when she allowed him to use the bathroom in the booking area for his colostomy care.  And at least some of the nurse defendants refused to allow him to use the bathroom in the nurse sick call area when he asked.  A reasonable jury could find that this was an objectively unreasonable response to safety risks that a reasonable nurse would have appreciated and responded to.

### 4.    Need for Cleaning Supplies

Outside the infirmary, nurses did not control detainees' possession of cleaning supplies, including toilet paper.  A detainee was required to seek additional supplies from a custody officer. It is true that the nurses could have asked custody to give Sherrill more supplies like toilet paper, but their failure to do so was like their failure to instruct him on how to empty his colostomy bag—

at the most, negligence.  No evidence suggests they made a decision not to ask that he have more supplies, only that they negligently failed to do so.

### 5.    Lack of Harm

The defendants point to the fact that Sherrill's colostomy never became infected during the time he was in the Jail as evidence that he suffered no harm from their conduct.  It is true that in order to prove a constitutional tort, a plaintiff must establish he suffered harm or a serious risk of harm. *Jackson v. Pollion*, 733 F.3d 786, 790 (7th Cir. 2013); *see* 42 U.S.C. § 1997e(e).  But infection is not the harm Sherrill alleges; pain, itching, and bleeding are.  And Sherrill's deposition testimony is sufficient to establish that he suffered these cognizable physical injuries.

### 6.    Passing Feces Through Anus

No evidence shows the defendant nurses were connected in any way with this incident, which is discussed below in connection with Dr. Shah.

### 7.    Dr. Shah

Although Sherrill often refers to "the defendants" collectively, it is clear that those general complaints, for the most part, do not include Dr. Shah.  Dr. Shah's relevant contact with Sherrill was very limited.  He ordered Sherrill to have supplies to change his colostomy bag every three days, and he saw Sherrill in person for medical services twice.  Both times Sherrill had listed another medical problem on his request to see the doctor and then tried to talk to Dr. Shah about his colostomy issues.  Dr. Shah refused because his doctor referral was not about his colostomy.

Dr. Shah was responsible for the first express order, as opposed to common practice, to give Sherrill replacement colostomy supplies every three days.  It was understood by the defendant nurses that this order included a proviso that if the bag was leaking or had otherwise failed, more supplies could be given as needed.  As discussed above, this schedule was objectively reasonable.

Dr. Shah's decision to respect the Jail's nurse sick call triage system was objectively

reasonable as well.  In his two visits with Dr. Shah in person, no evidence suggests Sherrill's mere appearance at the doctor's appointment would have alerted Dr. Shah to a legitimate colostomy problem.  Sherrill was simply trying to do an end-run around a sensible system to allocate scarce medical resources wisely.  Considering the totality of the circumstances, a reasonable doctor in Dr. Shah's position would not have understood there was a high degree of risk to Sherrill's health during those two visits.  In those situations, Dr. Shah could reasonably rely on the nurse sick call triage system to avert serious harm to Sherrill.

   With respect to the incident on August 9, 2021, there is no evidence from which a reasonable jury could conclude that Dr. Shah's response to Sherrill's report of passing stool was objectively unreasonable.  Sherrill reported an unlikely event—but one which could have indicated a serious problem with his colonoscopy if it were real.  The nurse reported to Dr. Shah that she had examined Sherrill and found no blood.  She also reported to Dr. Shah that she had taken samples and sent them for testing.  Even if she did not examine Sherrill, as Sherrill himself maintains, she reported to Dr. Shah that she had.  And no evidence suggests Dr. Shah's response to the nurse's report—inquiries about Sherrill's pain and orders for continued monitoring—was objectively unreasonable.  Sherrill may have felt that he should have gotten different treatment—an examination by a doctor or a trip to the emergency room—but his preference for different treatment does not make Dr. Shah's exercise of medical judgment objectively unreasonable.

   Again, by a deceptive sick call complaint, Sherrill managed to see Dr. Shah to ask him about his passing feces and blood.  Again, Dr. Shah refused to hear his complaints since they were not the reason for the visit but noted anyway that observation was all they could do at the Jail until it developed into a more serious problem.  Again, this was an objectively reasonable, if conservative, response to a possibly more serious problem with Sherrill's colostomy.  And the reasonableness of his decision was born out by negative test results and by no resulting emergent

15

situation.

Further, no evidence shows that Dr. Shah received and deliberately, purposefully, or even recklessly declined a request to order a single cell for Sherrill for medical reasons. He received no such request.

In sum, there is insufficient evidence from which a reasonable jury could find Dr. Shah's responses to Sherrill's serious medical needs were deliberate, purposeful, or reckless or were objectively unreasonable in violation of his due process rights. The Court will grant summary judgment for Dr. Shah.

**IV.    Conclusion**

The Court notes that analysis of this summary judgment motion was hampered by the defendants' decision to address whether particular conduct was inadequate rather than whether a particular individual provided inadequate care as a whole. To be liable under § 1983, an individual must be personally involved in or personally responsible for unconstitutional conduct. *Gonzalez v. McHenry Cnty.*, 40 F.4th 824, 828 (7th Cir. 2022); *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995). It is not enough to say a certain type of conduct was wrong; the plaintiff must prove *a defendant* acted wrongfully. So it is not enough for Sherrill to say it was objectively unreasonable to fail to check his bag every time he requested a new one between scheduled bag changes. Sherrill must prove that a specific defendant's failures amounted to unreasonable care in order to find that defendant liable. *See Smith v. City of Chi.*, 785 F. Supp. 3d 356, 391 (N.D. Ill. 2025) (no evidence defendant was personally involved in arrest, interrogation or confession alleged to have been unconstitutional); *Andreyev v. Kjorlie*, 455 F. App'x 693, 696 (7th Cir. 2011) (in the Eighth Amendment context, defendant's failing to provide a toothbrush a few times may not show intent or recklessness of that defendant). Each defendant must be given separate consideration, and if one defendant is liable, it need not follow that another is too. *See* Federal Civil Jury Instructions of the

16

Seventh Circuit, Instr. 1.27 (2017).  At trial, Sherrill will have to prove for each defendant that the particular defendant purposefully, knowingly, or recklessly provided him objectively unreasonable care considering the totality of their conduct.

For the foregoing reasons, the Court:

- **GRANTS in part** and **DENIES in part** the defendants' motion for summary judgment (Doc. 95):

    o The motion is **GRANTED** to the extent it seeks summary judgment for Dr. Shah and for nurses McLeod, Rokita, and Austin for a three-day bag replacement schedule, for failing to further instruct him about colostomy care, for not providing cleaning supplies, and for their response to Sherrill's passing feces through his anus;

    o The motion is **DENIED** to the extent it seeks summary judgment for defendants McLeod, Rokita, and Austin for their response to Sherrill's claims of leaks or a malfunctioning bag, their response to Sherrill's safety needs to care for his colostomy away from other detainees, and other responses to circumstances not addressed in the summary judgment motion; and

- **DIRECTS** the Clerk of Court to enter judgment accordingly at the close of the case.

Defendant Shah is terminated as a party to this case.  By separate order, the Court will set a telephone status conference to set dates for the Final Pretrial Conference and Trial.

**IT IS SO ORDERED.**
**DATED:  February 11, 2026**

s/ J. Phil Gilbert____
**J. PHIL GILBERT**
**DISTRICT JUDGE**
